# United States District Court

| EASTERN | DISTRICT OF | MICHIGAN |

UNITED STATES OF AMERICA

v.

NIQUELLA S. HARDWICK.

CRIMINAL COMPLAINT

CASE NUMBER: 06-30194

I, SA Christopher S. Pennisi, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about September, 2005 through January, 2006, in Wayne County, in the Eastern District of Michigan, defendant(s) did *(Track Statutory Language of Offense)*

make telephone calls and utilize a telecommunications device, whether or not conversation or communication ensures, without disclosing her identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who received the communications; and

make repeated telephone calls and repeatedly initiate communication with a telecommunications device, during which conversation or communication ensues, solely to harass any person at the called number or who received the communication;

in violation of Title 47 United States Code, Section(s) 227(a)(1)(C) & (E).
I further state that I am a(n) Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

*See Attached Affidavit Hereby Incorporated by Reference.*

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

FILED
APR 17 2006
CLERK'S OFFICE
DETROIT

_____
Signature of Complainant
Special Agent Christopher S. Pennisi
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

4/17/06     at    Detroit, Michigan
Date              City and State

Hon., U.S. Magistrate Judge              _____
Name & Title of Judicial Officer          Signature of Judicial Officer

## AFFIDAVIT

1. I, Christopher S. Pennisi, having been first duly sworn, do hereby depose and state as follows:

2. I am a Special Agent of the Federal Bureau of Investigation (FBI). I have been a Special Agent for one year and one month. I am currently assigned to investigations involving computer crimes, as well as other criminal investigations.

3. The information contained in this affidavit are based on my investigation, including interviews with victims and witnesses, review of documents, information provided by other employees of the FBI and other government agencies, and my experience and background as a Special Agent of the FBI. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that a violation of Title 47, United States Code § 223(a) has been committed by defendant NIQUELLA S. HARDWICK.

4. This investigation is involves Title 47, U.S. Code § 223(a), prohibiting obscene or harassing telephone calls in interstate communications. Section 223(a)(1) of Title 47 provides in pertinent part that:

(a) **Prohibited acts generally**

Whoever —

(1) in interstate or foreign communications —

\* \* \*

(C) makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensures, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications;

(D) makes or causes the telephone of another repeatedly or continuously to ring, with intent to harass any person at the called number; or

(E) makes repeated telephone call or repeatedly initiates communication with a telecommunications device, during which conversation or communication ensues, solely to harass any person at the called number or who receives the communication;

\* \* \*

shall be fined under Title 18 or imprisoned not more than two years, or both.

1

## DETAILS OF THE INVESTIGATION

### VICTIM: EDDIE PATTON

5. EDDIE PATTON, JR. is an internal medicine resident at St. John's Hospital in Detroit.

6. Although they did not attend high school together, PATTON met NIQUELLA S. HARDWICK while they were both in high school in Birmingham, Alabama.

7. Three years ago, PATTON ran into HARDWICK and gave her a business card. They did not keep in touch. In May of 2005, however, PATTON received an email from HARDWICK saying that she was in Houston and had just joined a sorority.

8. HARDWICK visited family in the Detroit area during Labor Day Weekend of 2005. While she was in Detroit, PATTON and HARDWICK went out, and afterwards, HARDWICK asked him whether they would continue to see each other in the future. PATTON did not commit to seeing her again.

9. On September 5, 2005, PATTON began receiving text messages, on his cell phone in Detroit, Michigan, from an unknown person. From September 7, 2005 until September 20, 2005, PATTON preserved these messages by keeping an electronic diary of them, including date and time sent, the person and phone number reported as the sender, and the message text itself.

10. Many of the messages that PATTON received concerned allegations of infidelity against his then girlfriend, CICELY DOWDELL.

11. Other text messages received by PATTON threatened financial harm or physical violence against himself or his friends. On September 9, 2005 at 8:01 AM, PATTON received text messages that incorrectly stated that he had been fired from his job. At 7:09 pm, he received a message stating "ask Ceci bout how we shpoopped for that damn mut and how I beat that ass in front of PetSmart on Sunday. Bitch got smart and I smacked her face." This message was repeated at 7:11 pm. At 7:31, PATTON received another stating "tell that bitch to give me my money back that I paid on her high ass Sallie Mae loans. Bitch gone be in debt forever. He received another version of the same message one minute later. At 9:08 pm, he received a message stating "Yo other bitch want give me her name. I'll find out and I'll find out where she live and fuck her up since she cursed me. I'm going to fuck her up." This message was immediately repeated.

12. On September 10, 2005 at 9:12, PATTON received a text message that stated "I saw those pictures of that other bitch, she's fine as hell look much better than Cicely. But I'm gone fuck her face up, she'll soon be ugly (Scarface)." This message was repeated at 9:14 pm and 9:18 pm. At 9:20 pm, he received a message stating "Better yet I'll fuck their faces up together throw both of em' in a dungeon and let them get to know each other.that should be interesting, don't U agree?" This message was repeated three times in the next two minutes. At 1:52 pm, he received a message stating "tell your bitch to pick up the phone and since she threatened me I'm gone whoop her ass when I found out who she is." This message was repeated twice in the next minute. At 10:45pm, he received a message stating "I have pictures of your fine ass bitch. I'm

2

gone cut her head off and paste it to a naked body and put it on the internet. this might cause her to get fired." This message was repeated three times in the next four minutes. At 11 pm, he received a message stating "Then I'll find out where this bitch work and let her employer no that she has naked pictures on the internet and they'll fire her." At 11:03 pm, he received a message stating "This bitch had the nerve to get her phone back on. I'm disconnecting it again and all of you all lights, (U, Cicely, & that fine bitch)."

13.  On September 11, 2005, PATTON received a text message at 11:01 am stating "Cicely Dowdell-Sallie Mae Balance is $153,734.52 help the bitch pay it and tell her to give me my money back. Those high ass student loans." This message was repeated at 11:01 am. At 9:23 pm, a message was sent to PATTON stating "Pizza Hut will deliver you a 8 pizzas in 30 minutes to 4600 Woodward Ave Detroit, MI 48201." This message was immediately repeated. PATTON never actually received any pizzas. At 9:24, he received a message stating "I'm sending 8 pizzas to that fine bitch too. Tell her I said enjoy." This message was immediately repeated. At 9:49 pm, a message was sent stating "Auto insurance for social security number #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 has been CANCELLED. Everybody else auto insurance will be cancelled too." At the time, PATTON had no auto insurance and no policies held by his family members were ever cancelled.

14.  On September 12, 2005, PATTON received a text message at 6:53 am stating "I went over that fine bitch house. Ask her why she didn't open the door? SCARY BITCH.." This message was immediately repeated. At 6:54 am, another message was sent stating "I heard her footsteps near the door, so I know she heard my knock or was she taking a peek out of her peep hole." This message was repeated twice over the next two minutes. At 6:59 am, PATTON received a message stating "The next time I go over there I gone get inn some way and dick her down real good and I'll ask who dick was the best mine or yours. Ha.ha.ha." This message was immediately repeated. At 7:52 pm a message was sent stating "Your bitch just answered the phone cursing and crying. 2 bad for the little baby. I almost have her address." This message was immediately repeated. On September 14 at 2:43 pm, a message was sent to PATTON stating "Cicely's BCM ID# 146862."

15.  PATTON discovered that DOWDELL, too, was the recipient of phone, voice mail and text message harassment that started at relatively the same time those sent to him. The only apparent motivation for all of these messages lay in a text message that PATTON did not preserve, but which stated that DOWDELL did something crazy and deserved to suffer. The harasser never revealed what this deed was but frequently referred to it.

16.  PATTON also received text messages to his hospital pager that were often simply random phone numbers.

17.  In addition to the text messages PATTON received on his personal cell phone, he also received telephone calls from blocked numbers. In many of these, the caller would not identify him or herself. Often, PATTON would ignore them, but occasionally answer, fearing that his phone would be cut off if he didn't, and try to speak to the caller.

18.  At some point in September, the unknown harasser accessed PATTON'S AMERICA ONLINE email account, epatto6636@aol.com, and read an email from a female friend whom

3

PATTON had helped complete some promotional work. The person forwarded this to DOWDELL.

19.   In either September or October of 2005, HARDWICK stated to PATTON on the phone that she recorded phone conversations between the two of them. Subsequently, an unknown person called PATTON and played a recording of DOWDELL checking her voice mail and listening to a message from another male.

20.   On September 16, 2005, PATTON requested Sprint, his cell phone service provider, to conduct a "call trace" based on the harassment via telephone he was experiencing at the time. Sprint provided results in the form of a "call report" with fields indicated the calling number, called number, start and end dates, call duration, repoll number, first cell and last cell.

21.   Sprint Corporate Security has informed me that "repoll number" is a value representing the physical switch a call intended for a cellular phone was routed through. Each switch is connected to many cell sites, which is why the cells the call was sent to are reported separately. In the case of the results provided in the call report for Mr. Patton's phone, most calls came through repoll number 212, which represents a Detroit metropolitan area switch. However, other calls on the report show repoll numbers of 687, 686 or 347. These repoll numbers are message gateways, rather than phone switches, and represent text messages rather than telephone calls. That these calls also have "0" values for the 1st and last cells is further indication that they are incoming text messages destined for the phone being reported on. There is no way to determine the originating party of a text message because they can be sent anonymously via the Internet.

22.   On November 22, 2004, HARDWICK filed a police report with the Houston Police Department wherein she provided a home phone telephone number of 281-461-4168 to the Officer taking her report. On September 6, 2005, HARDWICK again file a police report with Houston P.D. and provided 281-461-4168 as her home telephone number. In response to a subpoena, Sprint stated that 713-398-2974 is assigned to HARDWICK. Finally, the undersigned affiant interviewed HARDWICK on April 4, 2006 wherein she reported her home phone number to be 281-461-4168 and her cell phone number as 713-398-3974.

23.   Sprint provided PATTON a call report showing that the phone number 281-461-4168 called his cell phone six times on September 9, 2005, at 12:12 a.m., 12:13 a.m., 12:32 a.m., 7:45 a.m., 7:46 a.m., and 6:14 p.m. In addition Patton received 20 text messages that day, several of them arriving within seconds of the initiation and termination of HARDWICK'S phone calls, such as those at 6:14 p.m., 6:16 p.m. and 6:17 p.m.

24.   On September 10, HARDWICK's telephone(s) called PATTON's cell phone nine times, at 5:58 a.m., 5:59 a.m., 6:15 a.m., 6:18 a.m., 6:26 a.m., 9:19:00 a.m., 9:19:56 a.m., 9:21 a.m., and 10:38 p.m. PATTON also received 33 text messages that day.

25.   On September 11, HARDWICK's telephone(s) called PATTON'S cell phone five times, at 10:33 a.m., 1:46 p.m., 4:38 p.m, 4:39 p.m. and 4:40 p.m.. That day, PATTON received 30 text messages, with many of them arriving just before or after HARDWICK phoned PATTON, such as those at 10:34:10 a.m., 10:34:17 a.m., and 10:37 a.m.

4

26. On September 12, HARDWICK's telephone(s) called PATTON five times. 16 anonymous text messages were sent to PATTON'S phone that day, again with several of them being sent within minutes of calls by HARDWICK.

27. On September 13, the last day for which data was provided by Sprint, HARDWICK's telephone(s) called PATTON twice. Three anonymous text messages were sent to PATTON'S phone that day.

28. PATTON also obtained call logs for his home telephone, located in Detroit, Michigan, from Talk America, his home phone service provider. These logs show the date, time and calling number for all calls into PATTON'S home phone number, 313-831-4431, for the period from September 19 through October 2, 2005. These logs reveal the following calls from HARDWICK'S home and cell phones to PATTON's home phone:

   a. September 19, 2 calls: 11:29 pm, 11:32 pm
   b. September 20, 4 calls: 4:36 pm, 5:17 pm, 6:02 pm, 11:21 pm
   c. September 21, 7 calls: 6:08 pm, 11:24 pm, 11:25 pm, 11:26 pm, 11:28 pm, 11:30:14 pm, 11:30:46 pm
   d. September 22, 1 call: 10:07 pm
   e. September 23, 13 calls: 8:30 pm, 8:37 pm, 8:41 pm, 8:43 pm, 8:50 pm, 8:51 pm, 8:52 pm, 9:25 pm, 10:16 pm, 10:49 pm, 11:30 pm, 11:36 pm, 11:52 pm.
   f. September 24, 12 calls: 12:11 am, 12:14 am, 12:15 am, 12:19 am, 12:21 am, 9:17 am, 9:28 am, 9:29 am, 11:16 pm, 11:24 pm, 11:34 pm.
   g. September 25, 14 calls: 1:20 am, 1:21 am, 1:22 am, 1:34 am, 1:39 am, 10:19 am, 10:40 am, 10:47:00 am, 10:47:44 am, 10:49 am, 10:50 am, 10:51 am, 10:52 am, 11:02 am.
   h. September 26, 3 calls: 12:16:18 am, 12:16:56 am, 12:47 am
   i. September 28, 9 calls: 5:32 pm, 5:38 pm, 6:10 pm, 6:13 pm, 6:17 pm, 6:56 pm, 6:57 pm, 11:29 pm
   j. September 29, 1 call: 6:57 am
   k. September 30, 2 calls: 9:55 am, 4:16 pm

29. In addition to the above, during September 2005, PATTON received a large number of calls at his home originating from three pre-paid calling card numbers, 402-517-9978, 404-461-9978 and 720-587-9978. Calls made to these numbers reach a voice mail message that states "you are returning a call to a pre-paid calling service system, and the party that called you can not be reached at this number." In the experience of the affiant, pre-paid calling cards are sometimes used to conceal the identity of the calling party.

30. These calls, like those originating from HARDWICK'S phone numbers, generally came within 1.5 minutes of one another and sometimes continued for over an hour.

31. PATTON'S cell phone received 1 call from the above listed pre-paid calling card on September 9 and 6 calls on September 13. PATTON'S home phone received 21 calls from these numbers on September 23 and 23 calls on September 28.

5

32. The pattern of telephone harassment towards PATTON has not ceased since September of 2005. PATTON has received calls from HARDWICK as recently as January of 2006 wherein she questioned him about an email he sent her.

33. As late as April 5, 2006, PATTON received calls from a person who simply hangs up when the phone is answered, and has recently found calls on his caller I.D. from numbers that he cannot identify.

### VICTIM: CICELY DOWDELL

34. On September 6, 2005, at approximately 10:40 pm, DOWDELL'S cell phone rang and caller I.D. indicated that the call was from an unidentified number. DOWDELL did not answer the call. Immediately after that, her home phone rang and she again ignored the call. Eventually, her home phone stopped ringing and then her cell phone began ringing. Both phones alternately rang for a while until she answered one of them. She couldn't hear anyone on the other end, so she called her close relatives as well as her then boyfriend, EDDIE LEE PATTON, JR., to make sure that nothing had happened to any of them.

35. DOWDELL'S phones continued to alternately ring for hours, until eventually, she received a text message on her cell phone that said "he really doesn't want you any more." After returning to sleep DOWDELL received another text message that said she should check her email. Upon doing so, DOWDELL found an email that had been forwarded to her from PATTON'S email address. The forwarded message appeared to be from another woman and concerned Eddie's meeting with that other woman. For the remainder of that night, DOWDELL continued to receive constant phone calls.

36. The following day, September 7, DOWDELL went to her place of employment, TEXAS CHILDREN'S HOSPITAL where she received hundreds of text messages asking whether she knew "where her man was." At some point that night, someone had DOWDELL'S cell phone service shut off.

37. In addition, DOWDELL was receiving phone calls wherein the caller merely repeated "Cicely Dowdell" over and over.

38. By September 8th, PATTON was receiving calls and text messages from an unknown person. The text messages he received contained details of DOWDELL'S life including personal identifying information, including her social security number, and such trivia as her dog's name and what high school she went to.

39. That night, DOWDELL'S neighbor, CHRIS HERNDON, received several phone calls on his home phone that caller I.D. indicated were from unidentified parties. As soon as DOWDELL returned home, she began receiving calls from unidentified numbers, as if the person making them knew that she returned home at that precise time. In response to this, DOWDELL'S brother sent her a pay-as-you-go phone whose numbers was only disclosed to family members and possibly PATTON.

40. In late September or early October, the day after DOWDELL had flown to her parents'

house in Maryland, her parents' home phone rang. The caller was a female who asked for PATTON, and then asked for DOWDELL. These calls continued to come in. After they went unanswered for a while, DOWDELL'S pay-as-you-go phone rang endlessly. She eventually picked up without saying anything, and the other party would stay on the phone for 45 minutes at a time without saying anything. Following this, DOWDELL's mother, EQUINETTA DOWDELL began receiving calls on her cell phone. Mrs. Dowdell would answer and pretend that she was someone else. After a while, the harasser sent her a text message indicating she was aware of the ruse.

41. While staying at her parent's house, DOWDELL called to check on the status of a impending flight to Atlanta and discovered that it had been cancelled. She spoke with her credit card company and found out that her credit cards had been cancelled as well. She then called her car insurance company and found that someone had called into her insurance company but had not changed anything. Finally, DOWDELL received an email from SALLIE MAE regarding the status of her student loans. She called them and found out that her loans had been switched from deferred to active status.

42. On September 9, 2005 DOWDELL's home phone service was again disconnected and, as a result of the continued and broadening harassment, her employer, Texas Children's Hospital, provided her with a temporary place to stay.

43. DOWDELL began using "customer trace call" after receiving harassing phone calls. Customer trace call is a service offered by many phone companies wherein the phone company will capture the calling party number for any call they receive information for, regardless of whether caller I.D. has been blocked by the calling party. In order to make use of the service, one must merely press "*57" after receiving an abusive call. Retrieval of the numbers traced can only be accomplished through the service of legal process or direct contact by a law enforcement agency.

44. Detective Cecil Arnold, of the Pearland, Texas police department, who was investigating the harassment of DOWDELL pursuant to a complaint filed by her, discovered that one of the numbers traced by DOWDELL, 713-398-2974, belonged to NIQUELLA HARDWICK. This number called DOWDELL'S home at 10:18 pm on September 8, and 5:32 am on September 9.

45. On September 10, DOWDELL checked her personal email account, cecdow@hotmail.com, and found that someone had changed her password without her knowledge. DOWDELL spoke with Microsoft via phone, and their technical support confirmed that her account information had recently been changed.

46. On October 15, DOWDELL obtained a Verizon cell phone and implemented as many security measures as were available in an effort to prevent people from altering or accessing any information about the phone or its use. After a week, DOWDELL received a call from Verizon inquiring whether she had been calling the company for any reason. The Operator told her that someone was calling every hour to inquire about phone activity. Eventually, DOWDELL'S Verizon phone was cut off and she had to get another. On the second Verizon phone, messages were erased, and she'd call into the phone issuer and find out someone had been inquiring about her phone records.

47. On October 23, DOWDELL received 22 anonymous, unsolicited and harassing text messages.

48. As a result of the totality of the harassment, DOWDELL elected to disable text messaging service on her phone. As soon as she did this, her sister ARIANNE DENISE DOWDELL-MARSHALL began receiving a slew of text messages.

49. In October of 2005, DOWDELL-MARSHALL had her phone service cut off by an unknown person, and her phone's electronic phone book erased. Subsequently, all of the people whose numbers were stored in the phone book began receiving harassing phone calls.

50. The harassment that DOWDELL has suffered has not stopped since it began in September of 2005. In fact, on March 27, 2006, DOWDELL received a phone call from her former credit card company, MBNA AMERICA, inquiring whether DOWDELL tried to reopen an account she close last year. The MBNA representative told DOWDELL that the account had a note placed in its file saying "under no circumstances should this account be reopened." Nonetheless, they wanted to know whether she wanted the account reopened as a recent caller had requested that the account be reactivated. DOWDELL informed them that she was not the caller and did not want the account reopened. The bank told her that the person who called attempting to reopen the account provided the bank with DOWDELL'S old home phone number, her old cell phone and a Texas children's hospital phone number in attempting to verify that she was DOWDELL.

## PROBABLE CAUSE

51. In summary, I have learned from my investigation that, over Labor Day weekend in 2005, NIQUELLA S. HARDWICK went out with EDDIE PATTON, who was dating CICELY DOWDELL at the time. PATTON demurred when asked by HARDWICK whether they would see each other again. The following day, PATTON and DOWDELL became the victims of harassment via telephone and text message that has continued to the present day.

52. Call records for PATTON establish a pattern of unwanted phone calls from HARDWICK to PATTON throughout September 2005. All told, PATTON received at least 94 phone calls from HARDWICK'S phone numbers.

53. In addition to the phone calls that can be directly attributed to HARDWICK, PATTON received 51 calls from three pre-paid calling card numbers and 102 anonymous text messages during that same period.

54. Circumstantial evidence, such as the content and the contemporaneous nature of the numerous text messages PATTON received, shows that they were either from HARDWICK, or were sent at her direction by others.

55. These text messages threatened both financial and physical harm to PATTON and his friends and family, and were annoying and harassing in nature.

8

56. In my experience with harassment investigations involving technology and telecommunications, the use of anonymous communications methods is simply a means by which one who intends to harass can do so with impunity.

57. None of these calls or text messages were solicited by PATTON. Nonetheless, they continued from September, 2005 through January of 2006.

58. Based on the foregoing, I have probable cause to believe that from September, 2005 through January, 2006 NIQUELLA S. HARDWICK, defendant herein, has repeatedly violated Title 47, U.S.C. § 223(a)(1)(C) and (E) by knowingly and intentionally, and anonymously, making telephone calls and utilizing telecommunications devices, with intent to annoy, abuse, threaten, and harass the person at the called number.

CHRISTOPHER S. PENNISI
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me,
this 17 day of April, 2006.

United States Magistrate Judge

9